# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-2215V

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | | |
| ROMEO ALLAS, | * | Chief Special Master Corcoran |
| | * | |
| Petitioner, | * | Filed: March 25, 2025 |
| | * | |
| v. | * | |
| | * | |
| SECRETARY OF HEALTH AND | * | |
| HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

*Jeffrey S. Pop,* Jeffrey S. Pop & Assoc., Beverly Hills, CA, for Petitioner.

*Rachelle P. Bishop,* U.S. Dep't of Justice, Washington, DC, for Respondent.

## DAMAGES DECISION[1]

On November 24, 2021, Romeo Allas filed a petition for compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petitioner alleged his receipt of an influenza ("flu") vaccine on September 6, 2020, caused him to suffer Guillain-Barré syndrome ("GBS"). Petition (ECF No. 1) at 1. An entitlement hearing in the matter was held in Washington, D.C. on April 24, 2024, and I thereafter ruled in Petitioner's favor. *See* Ruling on Entitlement, filed Oct. 9, 2024 (ECF No. 48) ("Entitlement Ruling").

The parties subsequently endeavored to resolve damages, but could not do so. They have instead submitted their dispute to me for resolution. *See* Petitioner's Brief, filed Jan. 8, 2025 (ECF No. 53) ("Br."); Respondent's Opposition, filed Jan. 22, 2025 (ECF No. 54) ("Opp."); Petitioner's Reply, filed Jan. 28, 2025 (ECF No. 55) ("Reply").

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) [hereinafter "Vaccine Act" or "the Act"]. Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

For the reasons set forth in greater detail below, **I find that Petitioner is entitled to an award of damages in the amount of $165,000.00** for actual pain and suffering.

I.     **Factual Background**

A more complete summary of the relevant medical history and factual background is contained in my entitlement determination. *See generally* Entitlement Ruling at 2–5. I incorporate that history herein.

In short, on September 6, 2020, Petitioner (then 75-years-old) received the subject flu vaccine. Ex. 2 at 2. Three days later (the late evening of September 12, 2020), he went to the Henry Mayo Newall Hospital emergency department ("ED"), complaining of a sudden inability to walk. Ex. 3 at 69, 70, 74. Physical and neurologic exams were normal, although treaters did not test Petitioner's reflexes at this time. *Id.* at 71. Petitioner was subsequently transferred to Kaiser Permanente's Panorama City Hospital for further evaluation and monitoring due to his inability to walk, reported generalized weakness, and "indeterminate troponin with multiple cardiac risk factors." *Id.* at 74. Once there, Petitioner reported "3 days of lower extremity weakness and back pain," multiple instances where he ha[d] nearly fallen," "worsening lower back pain," and that he "was unable to walk with his walker." Ex. 4 at 1597.

Upon examination, Petitioner demonstrated diffuse lower lumber tenderness, mild midline tenderness of the spine, a swollen right knee, 2/5 lower extremity strength at hip flexion, 4/5 strength at plantar and dorsiflexion, reflexes 1+ bilaterally at knee, and an inability to take more than three steps with his walker. Ex. 4 at 1602. Petitioner underwent a lumbar puncture (revealing a high cerebrospinal fluid protein level, normal white blood cell count, glucose of 169) and an MRI of the lumbar spine (demonstrating no spinal cord compression). *Id.* at 1608, 1622, 1624, 1655.

Petitioner had an inpatient neurology consultation with Saien Lai, M.D. on September 13, 2020. *Id.* at 1654. On exam, Petitioner exhibited hip flexor strength deficits, although no baseline could be determined. *Id.* at 1659. His brain MRI showed mild chronic white matter ischemic changes and no evidence of acute infarction, while his lumbar spine MRI showed multilevel degenerative changes. *Id.* at 1214–15. Dr. Lai opined that Petitioner's "history of intermittent headache and acute lower back pain with right [greater than] left leg weakness, together with exam finding[s] of isolated right quad weakness and described [bilateral] lower extremity reflexes, [and] normal spinal imaging" might suggest [GBS]." Ex. 4 at 1214–15. The next day (September 14, 2020), neurologist Matthew Christopher, M.D., diagnosed Petitioner with GBS and "weakness of right leg"—noting further that Petitioner had an "acute onset [of right greater than left] lower extremity weakness and mild numbness on gross examination following flu shot." *Id.* at 1711.

Dr. Lai started Petitioner on a four-day course of IVIG, and he also received inpatient

physical therapy ("PT") through September 18, 2020. Ex. 4 at 1731–1852. At this time Petitioner began to demonstrate improved balance, endurance, strength, and stability. *Id.* at 1849–52. Prior to his discharge later that day, Petitioner underwent an EMG and NCS, which showed "[d]ecreased recruitment of motor unit on right L3-L5 myotomes" consistent with GBS, as well as "[s]uperimposed moderate to severe right median neuropathy at [the] wrist." *Id.* at 1209. Petitioner was subsequently discharged for home PT, having declined admission to a skilled nursing facility. *Id.*

Three days following his discharge, Petitioner had a telehealth appointment with his primary care provided, reporting that he could not walk and had been experiencing severe pain. Ex. 4 at 1125, 1134. He participated in twenty-seven additional sessions of PT and thirteen sessions of occupational therapy over the course of the next five to six months, and by late-October 2020 was experiencing *some* improvement in performing daily tasks, but remained unable to walk independently. *Id.* at 1207; *see generally* Ex. 5 (documenting PT and OT appointments). Petitioner was discharged from PT on March 6, 2021, and noted to have "made increasing gains in regard[] to transfers, ambulation, and musculoskeletal strength." Ex. 5 at 395. By October 2021, Petitioner reported that his strength and overall condition had returned to baseline and that he no longer required assistance when walking, although he took care in that regard and employed a cane for safety purposes. Ex. 7 at 78.

## II.     Parties' Arguments

The sole damages component in dispute is actual pain and suffering (Petitioner requests no reimbursement for any out-of-pocket medical expenses). Petitioner seeks $175,000.00, while Respondent argues for the lesser sum of $100,000.00.

*Petitioner*

Petitioner notes that he experienced a moderate GBS injury that resulted in "being bedridden for a couple of months and homebound throughout the duration of his home health services." Br. at 7. Over the course of his six-day hospitalization, Petitioner underwent four IVIG treatments, extensive diagnostic testing (i.e., MRIs, an EMG/NCV study, and a lumbar puncture), and approximately five months of extensive home health services consisting of PT and OT. *Id.* at 12; *see also* Ex. 5. Moreover, because Petitioner spent the first couple of months post-hospitalization bedridden, he relied heavily of his family for help. Br. at 9, 10.

To support his proposed demand, Petitioner offers several cases he deems comparable, where claimants received pain and suffering awards ranging from $165,000.00 to $180,000.00. *Gruba v. Sec'y of Health & Hum. Servs.*, No. 19-1157V, 2021 WL 1925630 (Fed. Cl. Spec. Mstr. Apr. 13, 2021); *McCray v. Sec'y of Health & Hum. Servs.*, No. 19-277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021); *Enstrom v. Sec'y of Health & Hum. Servs.*, No. 20-2020V, 2023 WL 345657 (Fed. Cl. Spec. Mstr. Jan. 20, 2023). The *Gruba* petitioner, for example, suffered a

3

moderately severe case of GBS—requiring a ten-day hospitalization with a three-day course of IVIG; a nine-day stay in an inpatient rehabilitation facility; seventeen PT sessions; and several diagnostic tests such as an EMG and lumbar puncture. *Gruba,* 2021 WL 1925630 at \*4. That claimant received $165,000.00 in actual pain and suffering. *Id. McCray* resulted in an award of $180,000.00 for actual/past pain and suffering, and involved a "moderate to serious" case of GBS. *McCray,* 2021 WL 4618549, at \*4. That petitioner's treatment included an approximate two-week hospitalization, IVIG therapy, an eighteen-day admission to a rehabilitation facility for PT and OT, followed by PT and OT for one month via home health services. *Id.* at \*2. Lastly, the *Enstrom* decision awarded $170,000.00 for actual pain and suffering and involved "a moderate course" of GBS that required a six-day hospitalization, a six-day admission to a rehabilitation hospital, a five-day course of IVIG, and sixteen outpatient PT sessions. *Enstrom,* 2023 WL 345657, at \*6.

Petitioner suggests that his injuries are consistent with those prior petitioners, noting that they all made "relatively significant recoveries" from GBS despite some continued residual symptoms. Br. at 18. However, Petitioner maintains that his case was also "more severe," as illustrated by his "inability to stand for six-weeks post-discharge" as well as his "inability to walk at all for two months post-discharge." *Id.* Moreover, Petitioner's overall treatment included significantly more home health services and therapy sessions than that of the other petitioners. *Id.*

*Respondent*

Respondent argues for a lesser award of $100,000.00. Opp. at 10. He maintains that Petitioner suffered a "mostly mild injury in severity and duration"—spending only one night in the ED and five days in the hospital, receiving four IVIG treatments, and undergoing six months of PT and OT home services (completing twenty-seven PT sessions and thirteen OT sessions). *Id.* at 12. He further emphasizes that Petitioner did not require neuropathic pain medications or interventions such as feeding tubes, breathing tubes, or catheterization; suffered no respiratory problems; and approximately eleven months after his GBS onset, Petitioner reported that he was at his baseline and gaining strength. *Id.*; *see also* Ex. 7 at 78. Moreover, Respondent argues that Petitioner's non-vaccine-related comorbidities (i.e., periodic severe back pain which was aggravated by ADLs, knee surgery, and gradual worsening bilateral knee pain) should not be considered when determining the appropriate pain and suffering damages award. Opp. at 12, 13.

Respondent contends that the facts and circumstances herein are distinguishable from the comparable cases cited in Petitioner's brief. Opp. at 13. He offers four cases of mild-to-moderate GBS injuries with pain and suffering awards ranging from $92,500.00 to $135,000.00. *Id.*; *Geschwindner v. Sec'y of Health & Hum. Servs.*, No. 17-1558V, 2022 WL 177372 (Fed. Cl. Spec. Mstr. Jan. 28, 2022) (awarding $92,500.00); *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497, at \*3 (Fed. Cl. Spec. Mstr. Mar. 30, 2022); *Shankar v. Sec'y of Health & Hum. Servs.*, No. 19-138V, 2022 WL 2196407 (Fed. Cl. Spec. Mstr. May 5, 2022); *Granville v. Sec'y of Health & Hum. Servs.*, No. 21-2098V, 2023 WL 6441388, at \*1–2 (Fed. Cl. Spec. Mstr. Aug. 30, 2023).

4

In *Geschwindner*, for example, the petitioner suffered a mild GBS injury featuring a three-day hospitalization, oral prednisone, MRIs, EMG/NCV testing, and eight outpatient physical therapy sessions. *Geschwindner,* 2022 WL 177372, at *1–3. The *Geschwindner* petitioner did not undergo any IVIG treatment but continued seeking treatment from a neurologist for approximately eight months post-vaccination. *Id.* The *Castellanos* decision awarded $125,000.00 for actual pain and suffering to a petitioner who required a nine-day hospitalization, five IVIG treatments, thirty-one days of inpatient rehabilitation, twenty-one outpatient PT sessions, and reported being able to walk without an assistive device approximately five months after onset. *Castellanos,* 2022 WL 1482497, at *10. The petitioner in *Shankar* required approximately two weeks of hospitalization inpatient rehabilitation, seven IVIG treatments, attended PT and OT over the course of several months, experienced GBS symptoms for a minimum of one year, and was awarded $135,000.00 for her actual pain and suffering. *Shankar,* 2022 WL 2196407, at *5, 6. Finally, *Granville* awarded $92,500.00 in actual pain and suffering and involved a mild GBS injury that required a five-day hospitalization, five IVIG treatments, six PT sessions, one OT evaluation, as well as a lumbar puncture. *Granville,* 2023 WL 6441388, at *4.

## III.   Relevant Law

### A.   *General Principles in Calculating a Pain and Suffering Award*

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, and award not to exceed $250,000.00." Section 15(a)(4). There is no mathematic formular for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").

Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.*, No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cir. 1995)). I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And of course, I may rely on my own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims.

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a decision from several years ago. *Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards—it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

### B.   *Pain and Suffering Awards in GBS Cases*

Table claims alleging GBS after receipt of the flu vaccine are common in the "special processing unit" ("SPU")—the process used by OSM for resolving matters it reasonably anticipates are amenable to fast resolution or settlement. I therefore include herein some discussion of the kinds of pain and suffering awards obtained in such cases.

As of July 1, 2024, on nearly every occasion that SPU has had to resolve the appropriate award for GBS pain and suffering (49 cases), over $100,000.00 has been awarded in every case but one (and there only the slightly lesser sum of $92,500.00 was awarded). The first-quartile value is $155,000.00, the median is $165,000.00, the third-quartile value is $178,000.00, and the largest award was $192,500.00. *Holmberg v. Sec'y of Health & Hum. Servs.*, No. 21-1132V, 2024 WL 4607929, at *3–5 (Fed. Cl. Spec. Mstr. Oct. 7, 2024).

A consistent starting consideration in reaching these determinations is that "GBS pain and suffering awards generally should be higher than those awarded to petitioners who have suffered a less frightening and physically alarming injury, such as SIRVA."[3] *Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021); *see also Castellanos*, 2022 WL 1482497, at *10 (emphasizing recognition of "the seriousness of GBS as a general matter," in awarding a six-figure sum); *Voeller v. Sec'y of Health & Hum. Servs.*, No. 20-1526V, 2023 WL 5019830, at *10 (Fed. Cl. Spec. Mstr. July 6, 2023) (noting GBS's "frightening" nature).

But not every GBS case is equally severe. Further details of the initial medical course are considered—including any mistake or delay in diagnosing GBS; any in-patient hospitalization and/or in-patient rehabilitation (and the duration of any such stays); diagnostic procedures (e.g., bloodwork, lumbar punctures, electrodiagnostic studies, imaging); the severity of symptoms at their nadir (e.g., involving incontinence or respiratory failure); the extent and effectiveness of

---

[3] Shoulder injury related to vaccine administration ("SIRVA") is another Table injury. 42 C.F.R. §§ 100.3(a), (c)(10).

treatment (e.g., IVIg plasmapheresis, pain medications); other interventions (e.g., feeding tubes, breathing tubes, catheterization); and any complications (e.g., sepsis during hospitalization).

Also relevant is a petitioner's long-term course—as evidenced by out-patient therapies, neurology evaluation, and other medical appointments concerning GBS; the results of repeat electrodiagnostic studies and other relevant tests; medical providers' assessments of the degree of recovery achieved; ongoing reliance on assistive devices and medications; and relevant treatment gaps. Previous opinions have recognized that "a substantial recovery does not mean that [an individual] has fully recovered from his GBS and has no ongoing sequela. It is common for petitioners to experience ongoing symptoms of GBS, such as numbness and fatigue, even with a good recovery." *Elenteny v. Sec'y of Health & Hum. Servs.*, No. 19-1972V, 2023 WL 2447498, at *5 (Fed. Cl. Spec. Mstr. Mar. 10, 2023). But symptoms of that nature are typically folded into a "typical" past pain and suffering award, and will not justify a future component. *See, e.g., id.*; *Miller v. Sec'y of Health & Hum. Servs.*, No. 21-1559V, 2023 WL 2474322, at *8 (Fed. Cl. Spec. Mstr. Feb. 10, 2023).

"The mere fact that a claimant had pre-vaccination comorbidities does not *per se* diminish the impact of [the vaccine injury] on his life—especially one as alarming and potentially life-altering as GBS—and therefore is not alone reason for a lower award." *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021). However, a special master is statutorily required to consider to what extent a petitioner's pain and suffering is truly "*from* the vaccine-related injury," Section 15(a)(4) (emphasis added), and nor from any unrelated preexisting or subsequently-developed medical issues. *See, e.g., Bircheat*, 2021 WL 3026880, at *4; *Gross*, 2021 WL 2666685, at *5.

Finally, the injury's impact on a petitioner's personal circumstances, including his or her family and other personal obligations, and professional life (whether or not lost wages are directly claimed), is properly taken into account as well. All of these factors are primarily gleaned from the medical records—although sworn statements and/or other evidence may also be considered, especially if they *supplement*, and do not contradict, the facts reflected in the medical records.

## ANALYSIS

In this case, awareness of the injury is not disputed. The record reflects that at all times, Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury. In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties in written documents and at hearing. I have also considered prior awards for pain and suffering issued in comparable cases, although I ultimately base my determination on the circumstances of *this* case.

7

The record shows that Petitioner, a retiree with a history of chronic back pain, presented on September 12, 2020 (three days post-vaccination), to the emergency department with a three-day history of lower extremity weakness and back pain. Ex. 4 at 1597. After being transferred to a different facility later that evening, Petitioner was hospitalized for five-days and diagnosed with GBS after undergoing extensive testing, including a lumbar puncture, and an EMG/NCV study. *Id.* at 1208, 1655. In addition, Petitioner received four rounds of IVIG infusions. *Id.* at 1721–22. Petitioner was discharged on September 18, 2020, with a discharge summary that repeated the diagnosis of GBS "leading to weakness of [the] right leg suspected post flu vaccine," as well as hyponatremia from mild syndrome of inappropriate secretion of antidiuretic hormone, for which he was to take salt tablets. *Id.* at 1209.

The record further indicates that Petitioner was discharged home due to his inability to "tolerate the [three] hours of daily therapy required for the inpatient acute rehabilitation level of care" and for "fear of contracting Covid at a long-term care facility." *Id.* at 1636, 1640; Br. at 3. Thus, from September 23, 2020 to March 6, 2021, Petitioner participated in twenty-seven PT sessions and thirteen OT sessions through Pegasus Home Health to aid with his GBS recovery. *See generally* Ex. 5. Three months post-hospitalization, Petitioner slept in a rented hospital bed in his downstairs living room as he was unable to go upstairs during this time. Br. 11, 18. Petitioner could stand at six-weeks following his discharge and started walking with an assistive device two months post-hospitalization; however, he still requires the use of a cane when walking long distances. *Id.* at 13, 18. During the course of his home health treatment, Petitioner remained homebound and required a significant amount of support from his family. Br. at 9–10.

Based on the foregoing, and considering the parties' written arguments, I find that Petitioner suffered a moderately severe GBS injury—although as a class, GBS injuries are distinguishable from many other kinds of more discrete or mechanical Program vaccine injuries. *Gross*, 2021 WL 2666685, at *5. Under such circumstances, I find the severity of duration of Petitioner's GBS symptoms warrant a significant pain and suffering award, but one that is on the lower end of the spectrum requested by Petitioner.

I equally find that Respondent's recommendation of $100,000.00 is too modest and does not give sufficient credence to the seriousness of GBS as a general matter, or to the facts of this specific case. Moreover, it also is wholly unsupported by his cited comparable decisions, unlike Petitioner's proposed figure. Respondent merely argues that because Petitioner's symptoms, hospitalization, treatment course for his GBS was somewhat less severe than the petitioners in prior relevant cases, and the fact that "he was unburdened by work, caretaking responsibilities, or external stressors," that a lower damages award is warranted. *See* Opp. at 16. While this may be true in part—it is *not* an adequate defense to Respondent's preferred figure.

For these reasons, I find the comparable pain and suffering determinations offered by Petitioner to be somewhat more helpful benchmarks for determining an appropriate award for pain and suffering herein. Other decisions were even better in terms of providing a guideline, however. Petitioner's circumstances were especially similar to what was considered in *Francesco v. Sec'y of Health & Hum. Servs.*, No. 18-1622V, 2020 WL 6705564 (Fed. Cl. Spec. Mstr. Oct. 15, 2020) (awarding $165,000.00 for actual pain and suffering)—a case not referenced by either side. The *Francesco* petitioner saw his primary care provider four days post-vaccination with complaints of tingling in his fingers and toes and weakness in his knees. 2020 WL 6705564, at *2. He was referred to the emergency department and subsequently admitted to the hospital for eight days, during which time he underwent a five-day course of IVIG. *Id.* Following his discharge, the *Francesco* petitioner was transferred to an inpatient rehabilitation facility where he completed twenty-two days of treatment. *Id.* The records further indicate that he began PT for approximately two months and demonstrated "rather rapid progress." *Id.* at *3.

Mr. Allas similarly presented to the emergency department six days post-vaccination (after consulting his primary care physician several days earlier about severe back pain that traveled from his back to his legs); required a six-day hospitalization; a four-day course of IVIG; diagnostic testing such as MRIs, an EMG/NCV study, and a lumbar puncture; and twenty-seven PT sessions and 13 OT sessions via home health services over a five-month period. Moreover, both the *Francesco* petitioner and Mr. Allas relied on assistive devices to walk for a period of time (although Mr. Allas continues to require the use of a cane for long distances). I find that Petitioner is entitled to the same award of $165,000.00 for actual pain and suffering.

## CONCLUSION

Based on the record as a whole and arguments of the parties, I award Petitioner a lump sum payment of **$165,000.00** for past pain and suffering, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement. This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court SHALL ENTER JUDGMENT in accordance with the terms of this Decision.[4]

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[4] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.